PAUL L. REIN, Esq. (SBN 43053)
CELIA MCGUINNESS, Esq. (SBN 159420)
CATHERINE CABALO, Esq. (SBN 248198)
LAW OFFICES OF PAUL L. REIN
200 Lakeside Dr., Suite A
Oakland, CA  94612
Telephone:     510/832-5001
Facsimile:      510/832-4787
reinlawoffice@aol.com

STEVEN L. DERBY, Esq. (SBN 148372)
THE DERBY LAW FIRM P.C.
1255 Treat Blvd., Suite 300
Walnut Creek, CA  94597
Telephone:     925/472-6640
Facsimile:      925/933-3964
derby@derbydisabilitylaw.com

Attorneys for Plaintiffs
PETER HOLLAND and KRISTEN HOLLAND

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER HOLLAND and KRISTEN HOLLAND,<br><br>  Plaintiffs,<br><br>  v.<br><br>THE RELATED COMPANIES, INC.; THIRD AND MISSION ASSOCIATES, LLC; DOES 1 through 10, Inclusive,<br><br>  Defendants. | CASE NO. 3:15-cv-03220 JSC<br><u>Civil Rights</u> |

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 1

POINTS AND AUTHORITIES.............................................................................................. 10

CONCLUSION ...................................................................................................................... 16

Plaintiff's Motion for Preliminary Injunction
CASE NO. 3:15-cv-03220 JSC                 S:\CASES\RELATED CORP\Pleadings\Preliminary Injunction\Preliminary injunction Motion final.docx

i

# TABLE OF AUTHORITIES

**CASES**

**Federal**

*Bronk v. Ineichen*,
54 F.3d 425 (7th Cir. 1995) .................................................................................................. 15

*City of Edmonds v. Washington State Bldg. Code Council*,
18 F.3d. 802 (9th Cir. 1994) .................................................................................................. 10

*Fair Hous. of the Dakotas, Inc. v. Goldmark Prop. Mgmt., Inc.*,
778 F. Supp. 2d 1028 (D.N.D. 2011) .................................................................................... 12

*Garcia v. Google, Inc.*,
766 F3d 929 (9th Cir. 2014) .................................................................................................. 14

*Gresham v. Windrush Partners, Ltd.*,
730 F.2d 1417 (7th Cir. 1984) ......................................................................................... 13, 14

*Hubbard v. Samson Mgmt. Corp.*,
994 F.Supp. 187 (S.D.N.Y.1998) ......................................................................................... 12

*Shell Offshore, Inc. v. Greenpeace, Inc*,
709 F3d 1281 (9th Cir. 2013) ................................................................................................ 14

*United States v. California Mobile Home Park Mgmt. Co.*,
107 F.3d 1374 (9th Cir. 1997) ............................................................................................... 11

*Wheeler v. Wexford Health Sources, Inc.*,
689 F3d 680 (7th Cir. 2012) .................................................................................................. 14

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7, 20 129 S. Ct. 365 (2008) ......................................................................... 11, 14, 15

**State**
*Bischoff v. Brittain*,
No. 2:14-CV-01970-KJM, 2014 WL 5106991, (E.D. Cal. Oct. 10, 2014) ........................... 13

**STATUTES, REGULATIONS AND RULES**

**Federal**

42 U.S.C. § 3613(c)(1) ............................................................................................................ 10

42 U.S.C. § 3604(f)(3)(B) ....................................................................................................... 10

**OTHER**
H.R. Rep. No. 711, 100th Cong., 2d Sess. 18, U.S.Code Cong. & Admin. News 1988, pp. 2173,
2179 ....................................................................................................................................... 15

Plaintiff's Motion for Preliminary Injunction
CASE NO. 3:15-cv-03220 JSC           S:\CASES\RELATED CORP\Pleadings\Preliminary Injunction\Preliminary injunction Motion final.docx

ii

**INTRODUCTION**

Plaintiff Peter Holland is a combat veteran who suffers from severe Post-Traumatic Stress Disorder ("PTSD") related to his military service. He and his wife, Plaintiff Kristen Holland, seek a preliminary injunction requiring defendants, his landlords, to reasonably accommodate his disability by moving them and their young daughter out of a "war zone" created by a massive construction project on the floor directly beneath their apartment.

Defendants' construction noise has been a daily trigger for Peter's PTSD symptoms since March with no end in sight. Although acknowledging that Peter is disabled, defendants have denied Peter's medically-supported requests for reasonable accommodation and so the Hollands have been forced to file suit. Meanwhile the daily construction noise continues virtually every weekday.

Peter has already noticed a marked deterioration in his mental state which affects not only his well-being but that of his wife and young daughter who are suffering right along with him. Peter has already experienced one violent outburst where he punched the wall of his apartment so hard he put an eighteen-inch crack in it. For Peter, every day seems worse than the last. The harm being done to plaintiffs and their young daughter each additional day they are forced to live in this "war zone" created by defendants cannot be measured by nor compensated with money.

Therefore, plaintiffs ask this court to order defendants to relocate Peter, Kristen and their young daughter away from the noise or out of the building completely before something truly tragic occurs and the damage cannot be undone. For these reasons, and to enforce plaintiffs' right to live in the community without discrimination based on disability, plaintiffs request this Court order defendants to grant plaintiffs' reasonable accommodation request.

**STATEMENT OF FACTS**

**I.   The Parties**

Defendant Third and Mission Associates, LLC, is the legal owner of the building known as "The Paramount" in downtown San Francisco. Defendant The Related Companies is the property manager for The Paramount. On information and belief, Third and Mission Associates

is a subsidiary of The Related Companies, which describes itself as holding 15 billion dollars in assets. Derby Dec. ¶ 3, Ex. B.

The Paramount is a 40-story apartment complex comprising approximately 500 units. P. Holland Dec. ¶ 14. In November 2008, Plaintiff Peter Holland and his wife Kristen Holland leased apartment 7C from defendants on a one-year lease. They have since renewed that lease five times, most recently in November 2014 for a lease expiring in December this year. P. Holland Dec. ¶ 17; K. Holland Dec. ¶ 4. Apartment 7C is a 660 square-foot studio apartment for which plaintiffs currently pay $2,795 per month. P. Holland Dec. ¶ 14.

Peter Holland is a combat veteran of the US Army who served in the invasion of Panama and in South Korea. P. Holland Dec. ¶ 4. He developed Post-Traumatic Stress Disorder (PTSD) as a result of his service.[1] Upon moving in at The Paramount, Peter Holland advised the leasing office that he suffers from PTSD from his military service. In fact, he had multiple lengthy conversations about military service and PTSD with defendants' Resident Building Manager, Jesse Leite, whose brother also is a combat veteran. P. Holland Dec. ¶ 16.

Kristen Holland is Peter's wife of 17 years. K. Holland Dec. ¶ 1. She is employed as a communications manager at the San Francisco Municipal Transportation Agency. *Id.* Their daughter, Georgia Holland, is almost three years old. *Id.*

### II. Major Construction Announced

In January of 2015—two months after plaintiffs renewed their lease—defendants announced a massive renovation which was to take place on the two floors directly beneath plaintiffs' apartment. On January 23, 2015, building management sent tenants an email announcement that "beginning in early February" The Paramount would conduct a "roughly" eight-month long, 16,500 square foot construction project on the 5th and 6th floors (labeled A1 and A2 by the building). The email said that the "new space will include multiple meeting rooms, state-of-the-art business and fitness facilities, a reserve-able [sic] private dining room with a

---

[1] Plaintiff's declaration provides the court with an extensive history and explanation of his service-related disability to explain the context and the urgency of this request for preliminary relief. P. Holland Dec. ¶¶ 7-13.

Plaintiff's Motion for Preliminary Injunction
CASE NO. 3:15-cv-03220 JSC      S:\CASES\RELATED CORP\Pleadings\Preliminary Injunction\Preliminary injunction Motion final.docx

- 2 -

1  demonstration kitchen and more indoor/outdoor entertainment and lounging spaces" and that they
2  "apologize for the inconvenience and appreciate your patience" during construction. P. Holland
3  Dec. ¶ 18; K. Holland Dec. ¶ 6.

4  Due to Peter's PTSD his home is the only place he feels safe, consequently he rarely
5  leaves it. He specifically selected that unit because it was a place of security where he could feel
6  safe and not feel threatened. P. Holland Dec. ¶¶ 12, 15; K. Holland Dec. ¶¶ 5, 21. When Peter
7  received the email, he became concerned that the construction would interfere with this sense of
8  safety in his home. Peter asked building management about the nature and duration of the
9  construction and what plans they had to mitigate the effects for those living so close to the
10 construction. His inquiries went largely unanswered. It became apparent that although building
11 management was planning to demolish an entire floor to create an interior stairway between two
12 floors directly below Peter's apartment, they simply expected him and his family to "grin and
13 bear it." P. Holland Dec. ¶ 26; K. Holland Dec. ¶ 7.

### III. Major Construction Triggers Peter Holland's PTSD Daily

16 Construction began in late February or early March 2015. The volume and proximity of
17 the noise and vibrations triggers Peter's PTSD on a daily basis. Although the construction is
18 taking place on the floor below Peter, it sounds as if they are working inside his apartment. P.
19 Holland Dec. ¶ 21; K. Holland Dec. ¶ 11.

20 During the first phase of the project, the noise came primarily from use of industrial
21 grinders used to remove aluminum studs. The noise generally began at around 8 AM and
22 continued off and on throughout the day until approximately 4 PM Monday through Friday. The
23 noise reminded Peter of the screaming sounds that people make when they have been shot and are
24 dying. Holland Dec. ¶ 22; K. Holland Dec. ¶ 11.

25 By early March, the daily noise could be heard even over loud music (Sex Pistols at full
26 volume). There appeared to be no end in sight and so the Hollands followed up with Mr. Leite.
27 P. Holland Dec. ¶¶ 24-25. Mr. Leite's response was that he was willing to have the hallway
28 outside of their apartment cleaned more often. K. Holland Dec. ¶ 9.

Plaintiff's Motion for Preliminary Injunction
CASE NO. 3:15-cv-03220 JSC    S:\CASES\RELATED CORP\Pleadings\Preliminary Injunction\Preliminary injunction Motion final.docx

- 3 -

On March 12th, Peter spoke with Ms. Cortese in building management. She asked what Peter would want for "compensation." Peter responded he did not know because he did not know how long the noise would continue. He was willing to "grin and bear it" if it would only be a few more days. The next week, it was quieter. Peter assumed the worst was over but as it turned out, the noise would get worse and would last for months. P. Holland Dec. ¶ 26.

On April 1, 2015, Peter texted his wife "the war has started." He noted "banging and occasional shooting." This was not Peter's PTSD clouding his perception but was in fact what was happening. Peter learned from Mr. Leite that the contractors were using powder-actuated tools, a type of nail gun that uses a .22 caliber blank gunpowder charge to drive a nail into concrete. P. Holland Dec. ¶ 28. To Peter, it sounds exactly like an M-16 assault rifle (which uses a .223 caliber of bullet). *Id*. Peter recalls his daughter Georgia being in the kitchen flipping her head left and right trying to figure out where the shooting was coming from. Peter told his wife that he "had not been on edge like this for a while." P. Holland Dec. ¶ 28; K. Holland Dec. ¶ 11.

Building management assured Peter that the "worst was over" but that was far from the truth. The first jackhammering began on April 3, 2015. P. Holland Dec. ¶ 29. Peter noticed the jackhammer had a similar cadence as a belt-fed M60 machine gun. At this point Peter began to take video to capture the experience of being inside his apartment. The video reflects the sound but not the volume experienced by anyone standing in the room. P. Holland Dec. ¶ 29, Exs. A-1-A-5.

**IV. Peter Asks for Help from His Landlord**

On April 3, 2015, Peter contacted Tanya Noeggerath—whom he understood to be the head of The Paramount's leasing office—and told her that he and his family could no longer live in apartment 7C under the current conditions. Ms. Noeggerath said she would be out of the office until April 8th but that she would speak with him when she returned. Peter then spoke with Ms. Cortese. He repeated his statement that he could no longer live with the noise and so was asking to be moved. Ms. Cortese stated that The Paramount had two units available at that time. They were Unit 21C, a 730 square foot one-bedroom apartment for $4,070 dollars per month,

Plaintiff's Motion for Preliminary Injunction
CASE NO. 3:15-cv-03220 JSC      S:\CASES\RELATED CORP\Pleadings\Preliminary Injunction\Preliminary injunction Motion final.docx

- 4 -

1  and unit 38F, a 715 square foot one-bedroom apartment for $4,155 dollars per month.  Although

2  they were one-bedroom units, not studios, these seemed comparable in square footage to the 660

3  square foot apartment the Holland family rented.  Ms. Cortese also told Peter that unit 30S, an

4  880 square foot one-bedroom apartment would become available in the near future for $4,775

5  per month.  Peter entered units 21C and 38F on April 6 and confirmed that he could not hear

6  construction noise in either unit.  P. Holland Dec. ¶ 32.

7  On the morning of April 8th, Peter called Ms. Noeggerath.  Before making that call, Peter

8  sent her a letter from Dr. Gretchen Lindner, Ph.D., a psychologist and PTSD specialist who

9  treated him at the VA (Veterans Administration) Hospital, describing his PTSD in clinical detail.

10  P. Holland Dec. ¶ 33, Ex. B.  Ms. Noeggerath confirmed she has received and reviewed the letter

11  and enclosures.  P. Holland Dec. ¶ 33.

12  Peter then requested (1) that his family be allowed to move within the building to either of

13  the open units, for the duration of their lease, while paying the same rent they are paying in 7C; or

14  (2) that they be allowed to break their lease and leave The Paramount with enough money to set

15  up household in a new location; or (3) that there would be some negotiated rent-reduction to

16  compensate them for the fact that they could no longer quietly enjoy their home.  It is important

17  to note that the last option was raised in April, before Peter knew the construction noise would

18  continue with the frequency and volume it has until now.  If he had known the noise would

19  continue to act as a daily and worsening trigger for his PTSD symptoms, he would not have

20  offered that option.  At this point the only possible solution is to take Peter and his family out of

21  the noise.  There is no amount of money that would persuade them to stay in apartment 7C any

22  longer.  P. Holland Dec. ¶ 34.  Ms. Noeggerath rejected all three options later that afternoon and

23  so Peter sought legal counsel.  *Id.* at ¶ 35.

24  Peter and his family cannot afford to move out of the building.  Their current rent is the

25  most they can afford.  It would be difficult to find an apartment that meets Peter's security needs

26  that they can afford.  P. Holland Dec. ¶ 36; K. Holland Dec. ¶¶ 21-24.  Therefore, merely

27  allowing Peter and his family to leave or to move while paying more rent and moving costs

28  effectively denies them the accommodation they seek.

Plaintiff's Motion for Preliminary Injunction
CASE NO. 3:15-cv-03220 JSC        S:\CASES\RELATED CORP\Pleadings\Preliminary Injunction\Preliminary injunction Motion final.docx

- 5 -

### V. Peter's Attorneys Make a Formal Written Request for Reasonable Accommodation

On May 20, 2015, counsel for the Holland family delivered a formal request for reasonable accommodation. Derby Dec. ¶ 4, Ex. C. The letter cited the applicable state and federal law regarding a landlord's duty to provide reasonable accommodation and included another letter from Shelley Peery, a neuropsychologist, documenting the effects continued exposure to construction noise were having on Peter's mental and physical well-being and on his family's safety. *Id*. Counsel's request for accommodation suggested four alternative solutions:

1. The Paramount will move the Holland family together with all of its belongings and furnishings at Paramount's expense to a different apartment above the 15th floor for the duration of their current leasehold (December 31, 2015) with no change in rent and no additional security deposit;

2. Should The Paramount wish the Hollands to return to their unit on the 7th floor once all construction related noise has ceased before 12/31/15, it will have the option of moving them back into their old unit, once again at Paramount's expense with no change in rent and no additional security deposit;

3. Should the construction continue past 12/31/15, the Holland family will have the option of vacating the unit without penalty or charge beyond their monthly rent or negotiating a new lease for the space they are then occupying;

4. Should The Paramount wish to discuss a voluntary surrender of the Holland's leasehold as an alternative, they are willing to consider moving now.

The letter requested a response to an "intolerable situation" by May 22, 2015.

On May 28, 2015, counsel for the landlord responded by letter. Speaking for his clients, counsel stated they were "well aware" of their obligations to provide reasonable accommodations to disabled persons under state and federal law. He further indicated that the letter from Mr. Holland's clinician "sufficiently establishes Mr. Holland's disability and for his disability-related need for relocation away from the noise." Derby Dec. ¶ 5, Ex. D. The response, however, did not offer any reasonable accommodation other than (1) the move to another unit and pay market

Plaintiff's Motion for Preliminary Injunction
CASE NO. 3:15-cv-03220 JSC     S:\CASES\RELATED CORP\Pleadings\Preliminary Injunction\Preliminary injunction Motion final.docx

- 6 -

1  rent or (2) to move out and accept $2,000 as a moving costs. *Id.* Neither offer could be accepted
2  because the Hollands lack the resources to move without compensation – otherwise they would
3  have done so months ago. P. Holland Dec. ¶ 36.

### VI. Continued Exposure to Construction Noise is Causing Irreparable Harm

The continued construction noise acts as a constant "trigger" to Peter's PTSD symptoms. Every day the Holland family is forced to live in that noise causes irreparable harm to them in all of the following ways:

1. Because the noise sounds like combat, Peter is perpetually on a war footing. He feels he is in a "war zone" and his military training makes him a danger to those around him, including his own family. More than once, he has lapsed back into that time of his life and actually "gone for his weapon" before realizing no one is actually shooting at him. P. Holland Dec. ¶¶ 38-39.

2. The random timing and nature of the noise also reminds Peter of combat. The intermittent nature of the noise reminds him of waiting around to be shot at by enemy forces. Sometimes the noise is all day, every day. Sometimes it is completely random. Sometimes the building management posts a notice that noise will be particularly bad on a given day but Peter has found these notices are usually wrong. P. Holland Dec. ¶ 40; K. Holland Dec. ¶ 12.

3. The construction noise simulating combat has exacerbated Peter's PTSD-related nightmares "greatly to a level that I lack the words to describe." P. Holland Dec. ¶ 41.

4. In order to develop coping skills to deal with his PTSD, Peter has learned to compartmentalize a lot of experiences in what he calls "boxes of horror." Living in this "war zone" created by defendants has reopened "the boxes of horror," reducing Peter to tears repeatedly. P. Holland Dec. ¶ 42.

5. The triggering and constant stress has physical consequences as well as mental. When Peter is triggered, all of his muscles tense for fight or flight. When it wears off, he is left with residual full body pain, such as aching muscles from the tension. As one example,

on June 24, 2015, Peter wrote a note on his phone that said, "Been sobbing off and on for days. Racking sobs while listening to loud music while alone in apartment. Suddenly felt like I had been stabbed in my upper back in my spine with an ice pick. Pain ran down both arms and down both legs. Barely made it to the bed. Wondering if I was having a heart attack. I thought about calling 911, but the immediate pain and numbness passed. Still feels like I have been hit in the upper back with a bat." P. Holland Dec. ¶ 43; K. Holland Dec. ¶¶ 13-15.

6. Peter's wife Kristen works full time and so Peter is home alone acting as their daughter's caregiver. Sometimes really loud music is the only thing that stops the spinning in his head, but he has to wear headphones, so then he can neither hear Georgia nor properly interact with her. P. Holland Dec. ¶ 45; K. Holland Dec. ¶ 16.

7. Georgia has a speech delay. She needs to be around other children to practice talking, but since the construction noise started, Peter, in his combat-ready state, cannot leave the house. Taking her out now feels dangerous to him. Specifically, he feels like he is "on patrol" at the playground. He fears he will react violently to any perceived threat or normal human interaction without his wife as a buffer and "second set of eyes." P. Holland Dec. ¶ 46; K. Holland Dec. ¶ 19.

8. Since the noise, Peter has further isolated himself socially – even from friends he routinely communicated with in social networks like Facebook. He has closed his account. Facebook used to be a large part of his life. Peter started a private Facebook group for the members of his unit with whom he had served to help them reconnect and support each other. About 50 of the men have joined the group. Peter has had no contact with anyone in that group since quitting Facebook. P. Holland Dec. ¶ 47.

9. Peter also may have lost a 30-year friendship with his best friend because of a stupid blow up which he attributes to his deteriorating mental state. He lost control with the friend because of the noise and because of the constant vigilance he feels necessary in the "combat zone" that his apartment has become. P. Holland Dec. ¶ 48. Kristen confirms that when Peter is triggered he can be difficult and angry for no immediately apparent

1  reason. K. Holland Dec. ¶ 15.

2  10. The PTSD triggering means that Peter is not confident he can control himself even when he needs to leave the house. He has even missed medical appointments as a result. He feels trapped. P. Holland Dec. ¶ 49.

3  11. The noise and triggers to his PTSD affect Peter's ability to focus and concentrate in his work as an attorney assisting other veterans to obtain benefits and services. When he is triggered, it affects his concentration, working memory, and short-term memory. P. Holland Dec. ¶ 50.

4  12. As a result of the construction, Peter is in a constant state of trigger. Whenever the noise begins he goes instantly into combat mode. When he hears the construction noise, the PTSD response in his mind tells him that he and his daughter are in danger. It triggers his instinct to fight, to go towards the danger and remove it. He fears for the safety of anyone he encounters – even his wife and daughter – in this state. P. Holland Dec. ¶ 52.

5  13. Peter has not committed violence on any person since leaving the Army. On May 5th, the prior two months of being in a near constant state of trigger by the construction caused Peter to punch the wall in his bathroom, leaving an 18-inch crack. Peter states, "I did not know I was going to do it. It just happened. This was truly disturbing, as I have never done anything like that before." P. Holland Dec. ¶ 53.

6  14. Even when not being actively triggered by construction noise (at night or on weekends) Peter's ability to function is limited to "keeping myself together." He has no energy for daily routine interaction. He is very sensitive to criticism and disagreement. Hyper-vigilance leads him to talk very fast and is exhausting. P. Holland Dec. ¶ 54.

7  15. Peter gets very little sleep for days. He has extreme and violent nightmares, so he hates to sleep. Then he will "crash" and sleep all day long, usually on the weekends when Kristen is home to care for Georgia. Though difficult, sleep is only thing that enables him to rebuild some reservoir of mental reserve. But then he loses that time with his wife and child, and leaves Kristen with all the responsibility for Georgia and the rest of their lives, which makes Peter feel guilty. P. Holland Dec. ¶ 55.

16. Peter is noticing that the noise affects his daughter as well. The noise obviously bothers her. She puts her hands over her ears and asks her father to "make it stop." Peter finds this both frustrating and heartbreaking. The noise is so loud, they cannot speak with each other and so they use hand signals. It affects their developing trust relationship. He has no patience with her as a toddler when she does things normal toddlers do. He feels "like I want to kill myself" when he yells at her. P. Holland Dec. ¶¶ 56-58; K. Holland Dec. ¶¶ 16, 18.

17. Peter's distress is affecting Kristen as well. There have been times when the noise has put Peter "in crisis" and he has to call her at work. She then has to rush home to avoid any further damage. She feels for her husband and he worries about the effect on her career. P. Holland Dec. ¶ 59; K. Holland Dec. ¶ 17.

18. Peter is truly afraid that staying in this triggering environment will do permanent damage to his mental state and, by extension, to his family, especially his daughter. He is concerned that Kristen and especially Georgia will be permanently marked and that he may never fully recover. P. Holland Dec. ¶ 60.

## POINTS AND AUTHORITIES

**I.   This Court is empowered to Grant a Preliminary Injunction in this Case.**

Congress established the Fair Housing Amendments Act ("FHAA") "to protect the right of handicapped persons to live in the residence of their choice in the community" and "to end the unnecessary exclusion of persons with handicaps from the American mainstream." *City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d. 802, 806 (9th Cir. 1994) (internal quotations omitted).

The FHAA specifically authorizes the Court to grant a preliminary injunction "if the court finds that a discriminatory housing practice has occurred or is about to occur." 42 U.S.C. § 3613(c)(1). Failure to grant a request for reasonable accommodation is one type of discrimination expressly prohibited by the FHAA supplements. 42 U.S.C. § 3604(f)(3)(B). This violation has been repeated daily for months and will continue indefinitely into the future if not enjoined by

Plaintiff's Motion for Preliminary Injunction
CASE NO. 3:15-cv-03220 JSC        S:\CASES\RELATED CORP\Pleadings\Preliminary Injunction\Preliminary injunction Motion final.docx

- 10 -

this court and so by the express statutory language of the FHAA, this court is empowered to and should enjoin this daily and continuing violation of the FHAA by requiring defendants to immediately grant plaintiffs' pre-litigation request for reasonable accommodation as set forth below.

**II. A Motion to Enjoin Defendants' Continuing Violation of FHAA Is Necessary and Appropriate in This Case**

Generally, "A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008). All three criteria are readily established in this case.

    A. <u>Plaintiffs Are Likely to Succeed on the Merits Because Defendants Concede That Plaintiff Peter Holland is Disabled and That His Disability Requires He Be Relocated During Construction and Because The Cost to Defendants to Relocate Plaintiff and His Family is Negligible</u>

In order to prevail on an FHAA claim of discrimination based on failure to reasonably accommodate, a plaintiff must demonstrate that (1) he suffers from a handicap as defined by the FHAA; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap "may be necessary" to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation. *United States v. California Mobile Home Park Mgmt. Co.,* 107 F.3d 1374, 1380 (9th Cir. 1997). Each of elements are either conceded by defense counsel or self-evident from defense counsel's letter in response to plaintiffs' written request for reasonable accommodation. (See Derby Dec., Ex. D) The letter states, at p.3, para. 2:

> "At this time, it is our client's position that Dr. Peery's May 16, 2015 statement is sufficient to verify Mr. Holland's disability and disability-related need for re-location away from his current unit."

Plaintiff's Motion for Preliminary Injunction
CASE NO. 3:15-cv-03220 JSC    S:\CASES\RELATED CORP\Pleadings\Preliminary Injunction\Preliminary injunction Motion final.docx

- 11 -

1  This statement thus *expressly* concedes the first two elements of plaintiffs' burden.  The third
2  element – knowledge – is self-evident from counsel's statement.  The final element is established
3  by counsel's rejection – in that letter – of all three alternatives suggested by plaintiff's counsel in
4  his May 20, 2015, letter.

5  In opposition, defendants may assert that they did not, in fact, refuse plaintiffs' requests
6  and did in fact offer to allow plaintiffs to re-locate within the building or to leave the building.
7  "Accommodating" plaintiffs' move but forcing them to pay more is equally as unreasonable as a
8  landlord who allows a service animal but requires a pet deposit , or a landlord that provides a
9  closer parking space but makes the mobility-disabled tenant pay a surcharge for it.  See, e.g., *Fair*
10 *Hous. of the Dakotas, Inc. v. Goldmark Prop. Mgmt., Inc.,* 778 F. Supp. 2d 1028, 1039 (D.N.D.
11 2011) [discriminatory to require fee for assistance animal under FHA]; *Hubbard v. Samson*
12 *Mgmt. Corp.,* 994 F.Supp. 187 (S.D.N.Y.1998) [discriminatory to charge fee for disability
13 parking place].  Just as the courts reject fees for other accommodations, this Court should reject
14 defendants' demand for market rent in exchange for giving plaintiffs an accommodation **which**
15 **they concede** is necessary to allow plaintiffs equal enjoyment of their leasehold.  By forcing
16 plaintiffs to incur the financial burden of those actions, defendants have effectively denied those
17 accommodations because plaintiffs lack the financial means to move.  P. Holland Dec. ¶ 36.

18 While conceding the elements of a request for reasonable accommodation, and thus
19 conceding the merit of that request, defendants have refused to grant that accommodation stating
20 that such requests are an "undue burden."  This argument borders on preposterous.

21 As stated above defendants are the owner and manager of a 40-story apartment building in
22 downtown San Francisco.  One defendant boasts of assets under management exceeding 15
23 billion dollars.  Derby Dec., Ex. B.  They are currently undertaking what is assuredly a multi-
24 million dollar renovation and yet they claim that relocating one family to a different unit for five
25 months is an undue burden.

26 The cost to defendants to relocate the Holland family for a few months is negligible and
27 largely offset by the increased rental income for the unit they now occupy at "below market" rent.
28 The Holland family currently rents a studio apartment consisting of approximately 660 square

1  feet for $2,795 per month. At the time defense counsel responded to Mr. Derby's May 20, 2015,
2  letter requesting reasonable accommodation, defense counsel indicated that there was a studio
3  apartment unit on the 16th floor (16N) but that absorbing the $600 per month increased rent
4  ($3,395) for at most five months plus "some relocation assistance… poses an undue financial
5  burden" on this 15 billion dollar company currently paying for a multi-million dollar renovation
6  directly underneath the Holland family unit. Derby Dec., Ex. D.

7  Ninth Circuit courts have held that imposing upon a disabled tenant the necessity to move
8  is irreparable harm that justifies a preliminary injunction. *Bischoff v. Brittain*, No. 2:14-CV-
9  01970-KJM, 2014 WL 5106991, at *8 (E.D. Cal. Oct. 10, 2014). The *Bischoff* Court found that
10 the burden upon the tenant, who would find it difficult to move because he suffered from "mental
11 and mood disabilities [and] a severe learning disability," and who asserted in an affidavit that he
12 could not afford moving costs, outweighed the burden on defendants that they would lose rental
13 income. *Id*.

14 The impacts on plaintiff and his family are at least as severe as those in *Bischoff*. Peter
15 struggles to maintain his self-control, suffers from sleep deprivation, finds himself confined to his
16 home, and cannot care for his child. His wife loses time from work. His daughter loses
17 socialization and loses progress in speech. Peter has hit the wall, literally, in his effort to
18 withstand the impact of defendants' construction noise on his disability. Every day is painful.

19 Defendants have admitted the existence of the elements of a viable FHAA claim and
20 ignoring a preposterous "undue burden argument" have offered no viable defense. Thus plaintiffs
21 will likely succeed on the merits.

B. <u>Plaintiffs Are Likely to Suffer Irreparable Harm if The Court Does Not Issue This Injunction Because Plaintiff Peter Holland is Being Subjected to the "War Zone" Created by Defendants on a Daily Basis with No End in Sight and Because Plaintiffs and Their Young Child Have Already Suffered Substantial Irreparable Harm</u>

Once plaintiff has established a likelihood of success under the FHAA, he need not make a showing of irreparable harm or that balancing of the equities tips in his favor because the FHAA specifically authorizes an aggrieved party to seek injunctive relief. *Gresham v. Windrush*

*Partners, Ltd.,* 730 F.2d 1417, 1423 (7th Cir. 1984). Even if such were not the case, plaintiffs have suffered and will likely continue to suffer substantial irreparable injury unless this court grants plaintiffs' request for injunctive relief.

Physical pain, if severe enough, may constitute irreparable injury. *Garcia v. Google, Inc.,* 766 F3d 929, 939 (9th Cir. 2014) ["Death is an irremediable and unfathomable harm, … and bodily injury is not far behind" (internal quotes and citation omitted)]; *Shell Offshore, Inc. v. Greenpeace, Inc.,* 709 F3d 1281, 1291 (9th Cir. 2013) ["no adequate remedy at law if 'serious risk of harm to human life'"]; *Wheeler v. Wexford Health Sources, Inc.,* 689 F3d 680, 682 (7th Cir. 2012).

In this case, Plaintiff Peter Holland is experiencing daily physical, mental and emotional pain. The noise is pervasive and unpredictable. Even when he is away from the noise on weekends or at night, he is haunted by the opening of his "boxes of horror" and plagued by PTSD nightmares enhanced "greatly to a level that I lack the words to describe." P. Holland Dec. ¶¶ 41-42. Peter is truly afraid that staying in this triggering environment will do permanent damage to his mental state and, by extension, to his family, especially his daughter. He is concerned that Kristen and especially Georgia will be permanently marked and that he may never fully recover. *Id.* at ¶ 60.

Plaintiffs have demonstrated the likelihood of further irreparable injury if defendants are not enjoined to provide a reasonable accommodation. Therefore, the court is empowered to and should act to avoid any *further* irreparable injury to plaintiffs.

C. <u>The Equities Favor Granting The Injunction Because Plaintiffs Lack the Financial Resources to Re-Locate and Because of the Public Interest at Stake in Enforcing Fair Housing Laws</u>

Before a preliminary injunction may issue, the court must identify the harm that a preliminary injunction might cause the defendant and weigh it against plaintiff's threatened injury. "[T]he real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied." *Winter v. Natural Resources*

1 *Defense Council, Inc.* (2008) 555 US 7, 24.

2 When balancing the equities in this manner, it becomes abundantly clear that the risk to plaintiffs if their injunction motion were to be denied grossly outweighs the potential harm to defendants if the injunctive relief request were to be improvidently granted. Plaintiffs and their young daughter have already suffered physical and emotional harm for months of living in the "war zone" created by defendants' multi-million dollar renovation. That harm is highly likely to continue. Moreover, the harm appears to be escalating in severity and, at least for Peter Holland, it may once again cause him to react violently without warning and, he fears, may prevent him from ever fully recovering even after the noise has ceased or he has left the building. P. Holland Dec. ¶ 60.

The harm to defendants—a multi-billion dollar company—is only money and is unlikely to reach even $10,000. There is simply no comparison to the Holland family's pain.

One other factor the court must consider is the public interest. The FHAA describes "a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995).

The House Report on the FHAA identifies a "clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream," H.R.Rep. No. 711, 100th Cong., 2d Sess. 18, U.S.Code Cong. & Admin.News 1988, pp. 2173, 2179, and adds that "the right to be free from housing discrimination is essential to the goal of independent living." *Id.*

There is thus a substantial public interest in bringing a large corporate landlord to heel with regard to their discriminatory policies and greatly misguided views of their obligations to accommodate disabled tenants. Therefore, the public interest also weighs heavily in favor of granting the requested relief.

//
//
//
//

**CONCLUSION**

For the foregoing reasons, plaintiffs respectfully request the Court issue a preliminary injunction ordering defendants to accommodate plaintiffs by moving them to an upper apartment in their building, free of construction noise, for the duration of their lease at their current rental rate and to pay the reasonable costs of such re-location.

Dated: July 10, 2015          Respectfully submitted,


LAW OFFICES OF PAUL L. REIN
THE DERBY LAW FIRM, PC

          */s/ Celia McGuinness*
By CELIA McGUINNESS
Attorneys for Plaintiffs
PETER HOLLAND and KRISTEN HOLLAND